1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10   KIMBERLY JONES,              )      NO. CV 08-2860-CT
                                  )
11              Plaintiff,        )      OPINION AND ORDER
                                  )
12         v.                     )
                                  )
13   MICHAEL J. ASTRUE,           )
     Commissioner of             )
14   Social Security,            )
                                  )
15                                )
                Defendant.        )
16   _____)

17

18        For the reasons set forth below, it is ordered that the matter be

19   **REMANDED** pursuant to sentence four of 42 U.S.C. Section 405(g) to

20   defendant Commissioner of Social Security ("the Commissioner") for

21   further administrative action consistent with this opinion and order.

22                    SUMMARY OF PROCEEDINGS

23        On May 1, 2008, plaintiff, Kimberly Jones ("plaintiff"), filed a

24   complaint seeking judicial review of the denial of benefits by the

25   Commissioner pursuant to the Social Security Act ("the Act").   The

26   parties filed a consent to proceed before the magistrate judge.   On

27   August 14, 2008, plaintiff filed her opening brief.   On October 9,2008,

28   the Commissioner filed a motion for summary judgment; memorandum of

points and authorities in support of defendant's cross motion for summary judgment and in opposition to plaintiff's motion for summary judgment.

<div align="center">SUMMARY OF ADMINISTRATIVE RECORD</div>

1.   Proceedings

On May 13, 2005 plaintiff filed applications for disability insurance benefits and Supplemental Security Income ("SSI"), alleging disability since May 28, 2004 due to rheumatoid arthritis, fibromyalgia, headaches, fatigue, interstitial cystitis, stress, and irritable bowel syndrome.  (TR 85-89, 313-15).[1]  The applications were denied initially and upon reconsideration.  (TR 42-47, 49-54).

On January 10, 2006, plaintiff filed a request for a hearing before an administrative law judge ("ALJ").  (TR 41).  On March 8, 2007, plaintiff, represented by an attorney, appeared and testified before an ALJ.  (TR 323-58). The ALJ also considered vocational expert ("VE") and medical expert ("ME") testimony.  On April 12, 2007, the ALJ issued a decision that plaintiff was not disabled, as defined by the Act, and thus was not eligible for benefits.  (TR 18-26).  On May 18, 2007, plaintiff filed a request with the Social Security Appeals Council to review the ALJ's decision.  (TR 13).  On January 31, 2008, the request was denied.  (TR 7-9).  Accordingly, the ALJ's decision stands as the final decision of the Commissioner.  Plaintiff subsequently sought judicial review in this court.

---

[1]     "TR" refers to the transcript of the record of administrative proceedings in this case and will be followed by the relevant page number(s) of the transcript.

1              2.   Summary Of The Evidence

2        The ALJ's decision is attached as an exhibit to this opinion and

3   order and, except as otherwise noted, materially summarizes the evidence

4   in the case.[2]

5                        PLAINTIFF'S CONTENTIONS

6        Plaintiff contends as follows:

7   1.   The ALJ's residual functional capacity assessment lacks the support

8        of  substantial  evidence  because  the  ALJ  failed  to  recognize

9        plaintiff's fibromyalgia as a severe impairment; and,

10  2.   The ALJ's credibility analysis lacks the support of substantial

11       evidence.

12                        STANDARD OF REVIEW

13       Under 42 U.S.C. §405(g), this court reviews the Commissioner's

14  decision to determine if: (1) the Commissioner's findings are supported

15  by substantial evidence; and, (2) the Commissioner used proper legal

16  standards.   Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996).

17  Substantial evidence means "more than a mere scintilla," Richardson v.

18  Perales, 402 U.S. 389, 401 (1971), but less than a preponderance.

19  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997).

20       When the evidence can reasonably support either affirming or

21  reversing the Commissioner's conclusion, however, the Court may not

22  substitute its judgment for that of the Commissioner.   Flaten v.

23  Secretary of Health and Human Services, 44 F.3d 1453, 1457 (9th Cir.

24  1995).   The court has the authority to affirm, modify, or reverse the

25  Commissioner's decision "with or without remanding the cause for

26  _____

27       [2]  Due to privacy concerns, the Court has redacted the ALJ's
     opinion to remove plaintiff's social security number.

28                                3

1 | rehearing." 42 U.S.C. §405(g). Remand is appropriate where additional
2 | proceedings would remedy defects in the Commissioner's decision.
3 | <u>McAllister v. Sullivan</u>, 888 F.2d 599, 603 (9th Cir. 1989).

4 | <center>DISCUSSION</center>

5 | 1.   The Sequential Evaluation

6 | A person is "disabled" for the purpose of receiving social security
7 | benefits if he or she is unable to "engage in any substantial gainful
8 | activity by reason of any medically determinable physical or mental
9 | impairment which can be expected to result in death or which has lasted
10 | or can be expected to last for a continuous period of not less than 12
11 | months." 42 U.S.C. §423(d)(1)(A).

12 | The Commissioner has established a five-step sequential evaluation
13 | for determining whether a person is disabled. First, it is determined
14 | whether the person is engaged in "substantial gainful activity." If so,
15 | benefits are denied.

16 | Second, if the person is not so engaged, it is determined whether
17 | the person has a medically severe impairment or combination of
18 | impairments. If the person does not have a severe impairment or
19 | combination of impairments, benefits are denied.

20 | Third, if the person has a severe impairment, it is determined
21 | whether the impairment meets or equals one of a number of "listed
22 | impairments." If the impairment meets or equals a "listed impairment,"
23 | the person is conclusively presumed to be disabled.

24 | Fourth, if the impairment does not meet or equal a "listed
25 | impairment," it is determined whether the impairment prevents the person
26 | from performing past relevant work. If the person can perform past
27 | relevant work, benefits are denied.

28 |

<center>4</center>

Fifth, if the person cannot perform past relevant work, the burden shifts to the Commissioner to show that the person is able to perform other kinds of work.   The person is entitled to benefits only if the person is unable to perform other work.   20 C.F.R. §§404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

2.   Issues

A.   Plaintiff's RFC

Plaintiff contends that the ALJ improperly assessed her RFC because he failed to credit all of plaintiff's severe impairments.   The ALJ found that plaintiff has the following severe impairments: rheumatoid arthritis and history of interstitial cystitis.   However, plaintiff argues that she also suffers from the additional severe impairment of fibromyalgia.

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities.   20 C.F.R. § 416.920(c).   Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting.   20 C.F.R. § 416.921(b); Bowen v. Yuckert, 482 U.S. at 141-42.   An impairment will be considered nonsevere when medical evidence establish only a "slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered."   Social Security Ruling 85-28; Bowen v. Yuckert, 482 U.S. at 154 n.12.

1    Plaintiff is not required to establish total disability at this
2    level of the evaluation.  Rather, the severe impairment requirement is
3    a threshold element which plaintiff must prove in order to establish
4    disability within the meaning of the Act.  Id. at 146.

5    Plaintiff has a long history of fibromyalgia.  "Common symptoms [of
6    fibromyalgia] include chronic pain throughout the body, multiple tender
7    points, fatigue, stiffness, and a pattern of sleep disturbance that can
8    exacerbate the cycle of pain and fatigue associated with this disease.
9    Benecke v. Barnhart, 379 F.3d 587, 589-90 (9th Cir. 2004).  As the Ninth
10   Circuit explained:

11       Fibromyalgia's cause is unknown, there is no cure, and it is
12       poorly-understood within much of the medical community.  The
13       disease  is  diagnosed  entirely  on  the  basis  of  patients'
14       reports of pain and other symptoms.  The American College of
15       Rheumatology issued a set of agreed-upon diagnostic criteria
16       in 1990, but to date there are no laboratory tests to confirm
17       the diagnosis.

18   Id. at 590.  Fibromyalgia is defined as "widespread pain in all four
19   quadrants of the body for a minimum duration of 3 months and at least 11
20   of the 18 specified tender points which cluster around the neck and the
21   shoulder, chest, hip, knee, and elbow regions."  See Wolfe F, Smythe HA,
22   Yunus MB, Bennet RM, Bombardier C, Goldenberg DL, et al.  The American
23   College  of  Rheumatology  1990  Criteria  for  the  Classification  of
24   Fibromyalgia: Report of the Multicenter Criteria Committee Arthritis
25   Rheum 1990; 33:160—72.

26   As the ALJ acknowledged, plaintiff's treating rheumatologist Samy
27   Metyas,  M.D.,  diagnosed  plaintiff  with  rheumatoid  arthritis  and

28

fibromylagia in August 2004. At that time, plaintiff presented with tenderness and swelling of both elbows, wrists, hand joints, knees, ankles and tarsal joints. (TR 19-20). In August 2005, Dr. Metyas re-diagnosed severe fibromaylgia. (TR 20). The ALJ further acknowledged Dr. Metyas's finding of 18 tender points in February, April, May, and August 2005. (TR 22).

In addition to the medical evidence discussed by the ALJ, the record reflects that plaintiff received ongoing treatment from Dr. Metyas for fibromyalgia. (TR 217-67). Plaintiff consistently complained of body pain, joint stiffness and pain, and difficulty sleeping. (TR 210, 218, 235, 239, 245, 249, 251, 252, 271-72, 292). Significantly, each of plaintiff's independent treating physicians diagnosed fibrolmyalgia. (TR 213, 217-67, 272, 273, 280-84, 287, 292-95).

In light of this evidence, it appears plaintiff has proven that she suffers from more than a slight physical abnormality with respect to her fibromyalgia. Although this evidence may not be enough to prove that plaintiff is disabled within the meaning of the Act, it is sufficient to satisfy the "threshold element" of a "severe" impairment at step two of the sequential evaluation. Id. at 146. Accordingly, this action must be remanded to allow for a continuation of the five step sequential evaluation.

B. Plaintiff's Credibility

Plaintiff contends the ALJ erred in assessing her credibility. Plaintiff argues that the ALJ mischaracterized plaintiff's testimony and improperly rejected plaintiff's credibility based on a lack of objective medical evidence and an ability to perform limited daily activities.

The Commissioner evaluates a plaintiff's symptom testimony under a two-step analysis. First, a plaintiff in a social security case must "produce medical evidence of an underlying impairment which is reasonably likely to be the cause" the symptoms alleged. <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 343 (9th Cir. 1991).

Second, once the plaintiff produces this evidence, the medical findings need not support the severity of the symptoms, and the ALJ may not discredit the plaintiff's allegations solely on the ground that the allegations are unsupported by objective medical evidence. <u>Id.</u> at 346-47. In the absence of affirmative evidence that a plaintiff is malingering, the Commissioner's reasons for rejecting the plaintiff's testimony must be clear and convincing. <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996). If the ALJ rejects the plaintiff's allegations as not credible, he or she "must specifically make findings which support this conclusion." <u>Bunnell v. Sullivan</u>, 947 F.2d at 345. The ALJ must state specifically what symptom testimony is not credible and what facts in the record lead to that conclusion. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1284 (9th Cir. 1996); <u>see also Lester v. Chater</u>, 81 F.3d at 834 ("[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the [plaintiff's] complaints").

In weighing credibility, the Commissioner may consider, among other things, the extent of treatment or any unexplained failure to seek treatment, inconsistent testimony or inconsistencies between testimony and conduct, and work records. <u>Orn v. Astrue</u>, 495 F.3d 625, 636 (9th Cir. 2007); <u>Smolen</u>, 80 F.3d at 1284.

1    Here, plaintiff produced evidence that she suffered from rheumatoid
2    arthritis, interstitial cystitis, fibromyalgia, and, to a lesser extent,
3    irritable bowel syndrome and depression, impairments that are reasonably
4    likely to produce the alleged symptoms.  Moreover, there is no evidence
5    of malingering.  Thus, the ALJ was required to give clear and convincing
6    reasons for discounting plaintiff's subjective complaints of impairment.

7        First, the ALJ rejected plaintiff's credibility based on perceived
8    inconsistencies in her testimony.  According to the ALJ, plaintiff
9    testified that her sons, ages 15, 17, and 18, do all of the "shopping,
10   cleaning, cooking and other chores," a claim the ALJ disbelieved because
11   the young men were in school during the day.  The ALJ explained that
12   plaintiff later "clarified" her testimony by stating that her sons do
13   "most" of the work, but they only began to help within the year prior to
14   the hearing.  Before her sons helped with household chores, plaintiff
15   did all of the housework.  Also, the ALJ summarized plaintiff's
16   testimony as claiming her "average day includes getting up at 7:00 am,
17   taking the children to school, shops, cuts her own hair and nails, cooks
18   and does light housekeeping."  (TR 24-25).  The ALJ further stated that
19   plaintiff's "average day consists of taking her niece to pre-school, do
20   the laundry, straightens up the house, drives a car, and prepare simple
21   meals."  (TR 25).

22       The ALJ significantly mischaracterized plaintiff's testimony.  A
23   materially "inaccurate characterization of the evidence" by the ALJ
24   constitutes error.  Regennitter v. Commissioner, 166 F.3d 1294, 1297
25   (9th Cir. 1999).  Plaintiff did not testify that her sons do all of the
26   "shopping, cleaning, cooking and other chores."  Rather, she testified
27   that her sons do the "majority" of the housework, that the cooking

28
                                    9

responsibilities are shared between plaintiff and two of her sons, and that she goes grocery and clothes shopping herself. (TR 333-34). As to housework, plaintiff testified only that she makes her six-year old niece's bed. (TR 334). Plaintiff honestly testified that her sons took up more of the housework during the year prior to the hearing, as she became unable to do many of the household chores. She explained that she previously had done the housework herself. (TR 334). Moreover, plaintiff testified that her average day begins at 7:00 am, that she takes only her niece to school, and that her activities throughout the rest of the day depend on her energy level. (TR 333). Although she testified she generally is able to do some shopping, personal care, cooking, and light housework, she never testified to completing all of these activities on a daily basis. Plaintiff admitted in a June 2005 Exertional Daily Activities Questionnaire that she did light housework, drove a car, and attempted to do laundry. (TR 110-12). This assessment of her daily activity in June 2005 is consistent with her testimony that her sons took on more of the household chores during the year prior to the March 2007 hearing and that previously she performed all the housework.

The other factors relied upon by the ALJ in rejecting plaintiff's subjective complaints of impairment are also insufficient. First, the ALJ relied heavily on plaintiff's ability to perform some daily activities. As explained above, at the time of the hearing plaintiff admitted to performing such daily activities as taking her niece to school, assisting her sons with cooking responsibilities, and making her niece's bed. However, plaintiff need not be "utterly incapacitated" in order to be found disabled; the mere fact that plaintiff is able to

1  carry on some daily activities, especially minimally strenuous

2  activities such as those performed by plaintiff, does not detract from

3  plaintiff's credibility on the ultimate issue of disability.  <u>Vertigan</u>

4  <u>v. Halter</u>, 260 F.3d 1044, 1050 (9th Cir. 2001).

5       The ALJ also rejected plaintiff's subjective complaints based on

6  what the ALJ characterized as inconsistent findings as to plaintiff's

7  fibromyalgia.  The ALJ's conclusion is not supported by the evidence.

8  First, the ALJ explained that plaintiff was never found to suffer from

9  trigger points, but only from tender points.  (TR 26).  However,

10  according to the American College of Rheumatology, fibromyalgia is

11  characterized by at least 11 of the 18 specified "tender points," not

12  trigger points.[3]  <u>See</u> Wolfe F, Smythe HA, Yunus MB, Bennet RM, Bombardier

13  C, Goldenberg DL, et al.  <u>The American College of Rheumatology 1990</u>

14  <u>Criteria for the Classification of Fibromyalgia: Report of the</u>

15  <u>Multicenter Criteria Committee</u> Arthritis Rhuem 1990; 33:160–72.  In

16  addition, the ALJ noted that "the doctors have generally found

17  [plaintiff] to have full or near full range of motion of the joints, 5/5

18  motor strength, no atrophy and physical examinations generally within

19  normal limits.  (TR 26).  Yet the American College of Rheumatology does

20  not include range of motion, motor strength, or atrophy within the

21  established diagnostic criteria for fibromyalgia.  <u>Id.</u>  Moreover,

22  plaintiff's physical examinations were not "generally within normal

23  limits," but reflect repeated findings of swollen joints, reactive

24

25  ――――――――――――――――――――

26       [3]  Significantly, the ALJ is also incorrect in stating that
the record does not reflect that plaintiff suffered from any
27  trigger points.  Plaintiff received trigger point injections from
Dr. Metyas on at least two occasions.  (TR 238, 242).

28

tender points, and irregular laboratory reports. (TR 218, 225, 227, 233, 235, 239, 244, 248, 249, 253, 266-67, 270).

Next, the ALJ rejected plaintiff's complaints of mental impairment based on "her in-court presentation." However, the ALJ does not state what about her appearance at the hearing led the ALJ to conclude she does not suffer from the severity of mental health symptoms alleged. Such a general conclusion is insufficient. Smolen v. Chater, 80 F.3d at 1284 (ALJ must state specifically what symptom testimony is not credible and what facts in the record lead to that conclusion); see also Lester v. Chater, 81 F.3d at 834 ("[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the [plaintiff's] complaints").

The ALJ also attempted to discredit plaintiff's complaints of mental impairment because she did not seek treatment. Unexplained failure to seek medical treatment may discredit a claimant's allegations of disabling subjective symptoms. See Bunnel v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991); Fair v. Bowen, 885 F.2d 597, 603-04 (9th Cir. 1989); Williams v. Bowen, 790 F.2d 713, 715 (8th Cir. 1986). In the present case, however, plaintiff's failure to seek medical treatment was not unexplained. Plaintiff testified that her physician referred her to a psychologist but that she did not make an appointment because she lost her health insurance. (TR 331). The Ninth Circuit has "proscribed the rejection of a claimant's complaints for lack of treatment when the record establishes that the claimant could not afford it." Regennitter v. Commissioner, 166 F.3d 1294, 1297 (9th Cir. 1999); see Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see also Gamble v. Chater, 68 F.3d 319, 322 (9th Cir. 1995) ("[a]lthough progress has been made in

1   providing affordable medical care to the needy . . . many Americans are
2   without the means or the opportunity to obtain necessary medical care.
3   Social Security disability and SSI benefits exist to give financial
4   assistance to disabled persons because they are without the ability to
5   sustain themselves.   It flies in the face of the patent purposes of the
6   Social Security Act to deny benefits to someone because he is too poor
7   to obtain medical treatment that may help him") (citations and
8   quotations omitted).

9       The ALJ acknowledged that plaintiff did not have health insurance,
10  but insisted that plaintiff should have sought out free or low cost
11  treatment.   (TR 25).   Underlying this finding is the unexplained
12  assumption that appropriate mental health treatment was available at low
13  or no cost to plaintiff and that she was eligible for such benefits.
14  Absent some evidence that appropriate low-cost mental health treatment
15  was available to plaintiff, the ALJ's decision is not supported by
16  substantial evidence.

17      Finally, the ALJ relies extensively on a lack of objective medical
18  evidence to support the severity of plaintiff's symptoms.   Once
19  plaintiff produces objective medical evidence of an underlying
20  impairment, the Commissioner may not reject plaintiff's subjective
21  complaints based solely on a lack of objective medical evidence to fully
22  corroborate the alleged severity of pain.   Moisa v. Barnhart, 367 F.3d
23  882, 885 (9th Cir. 2004) (holding that the ALJ clearly erred in
24  rejecting the plaintiff's subjective pain testimony solely for lack of
25  objective medical evidence corroborating the testimony, where plaintiff
26  suffered from a series of severe impairments capable of causing pain);
27  Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991).   Because the

28

remaining factors relied upon by the ALJ are insufficient, the lack of objective medical evidence cannot, in and of itself, support the ALJ's credibility determination.

The ALJ's errors may have been material to the disability analysis. Contrary to Plaintiff's argument, however, it is not clear that Plaintiff necessarily would be found totally disabled for the entire claimed period of disability, even if Plaintiff's testimony were fully credited.  Hence, remand is appropriate.  See Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003) ("Connett") (remand is an option where the ALJ fails to state sufficient reasons for rejecting a claimant's excess symptom testimony); Byrnes v. Shalala, 60 F.3d 639, 642 (9th Cir. 1995) (where the ALJ's credibility findings are insufficient, remand is appropriate).

## REMAND IS APPROPRIATE IN THIS CASE

The decision whether to remand a case for additional evidence is within the discretion of the court.  Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987).  Remand is appropriate if the record is incomplete and additional proceedings would remedy defects in the Commissioner's decision.  McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989).

Having considered the record as a whole, it appears that the present record is insufficiently developed.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>CONCLUSION</u>

    Accordingly, it is ordered that the matter be **REMANDED** pursuant to sentence four of 42 U.S.C. §405(g) to the Commissioner for further administrative action consistent with this opinion.

DATED: October 10, 2008

CAROLYN TURCHIN
UNITED STATES MAGISTRATE JUDGE

15

**18**

## SOCIAL SECURITY ADMINISTRATION
### Office of Disability Adjudication and Review

### DECISION

**IN THE CASE OF**

Kimberly A. Jones
(Claimant)

**CLAIM FOR**

Period of Disability, Disability Insurance
Benefits, and Supplemental Security Income

(Wage Earner)

(Social Security Number)

### JURISDICTION AND PROCEDURAL HISTORY

On April 29, 2005, the claimant protectively filed a Title II application for a period of disability and disability insurance benefits. The claimant also filed a Title XVI application for supplemental security income on May 13, 2005. In both applications, the claimant alleged disability beginning May 28, 2004. The claims were denied initially on June 12, 2005, and upon reconsideration on November 7, 2005. Thereafter, the claimant filed a timely written request for hearing on January 10, 2006 (20 CFR 404.929 *et seq.* and 416.1429 *et seq.*). The claimant appeared and testified at a hearing held on March 8, 2007, in Long Beach, California. Also appearing and testifying were Harvey L Alpern, an impartial medical expert and Alan Boroskin, an impartial vocational expert. The claimant is represented by Alexander B. Boudov, an attorney.

### ISSUES

The issue is whether the claimant is disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

With respect to the claim for a period of disability and disability insurance benefits, there is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through December 31, 2008. Thus, the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

After careful consideration of all the evidence, the undersigned Administrative Law Judge concludes the claimant has not been under a disability within the meaning of the Social Security Act from May 28, 2004 through the date of this decision.

See Next Page



EXHIBIT

## EVALUATION OF THE EVIDENCE

The claimant is a 40-year-old individual, born on August 21, 1966, with a high school education and past relevant work as a building inspector (DOT #168.267-010), a light and skilled (SVP 7) job, actually performed at sedentary-to-light exertion; as an administrative assistant (DOT #169.167-010), a light and skilled (SVP 6) job, actually performed at sedentary-to-light exertion; as a customer service representative (DOT #249.262-010), a sedentary and skilled (SVP 6) occupation; and as a payroll clerk (DOT #215.382-014), a sedentary and semi-skilled (SVP 4) position. The claimant has not engaged in substantial gainful activity since her alleged onset date of May 28, 2004. The claimant alleges disability due to rheumatoid arthritis, fibromyalgia, headaches, fatigue, interstitial cystitis, irritable bowel syndrome, insomnia and stress. At the hearing, the claimant testified that the major reason keeping her from working is the fatigue, pain and inability to focus.

The medical record confirms the claimant's long history of irritative bladder symptoms that culminated in hydrodilatation in 1996 and resulting in a diagnosis of interstitial cystitis. (Exhibit 1-F: 28). In 1997, Dr. Albert Assali noted that this was a chronic bladder disease requiring continued intermittent care over the years (Id. at 22). A repeat biopsy 1998 was unremarkable with negative urine cytology and good bladder capacity (Id. at 19). An intravenous pyelogram was normal and urine cultures were negative. The only helpful treatment appears to be hydrodilatation of the bladder (Id. at 4) with relapses about 5-6 months later (Exhibit 2-F: 10). In 1999, the claimant had a moderate response to high-dose Elmiron therapy with significant relief in urine urgency and frequency (Id. at 2).

In August 2004, the claimant was evaluated by Dr. Richard Shubin for complaints of fatigue of six-month's duration, joint pains, poor sleep, headaches and transient tingling and numbness in the arms and legs. The claimant denied any bowel dyscontrol. She admitted to a stable mood An MRI of the brain showed mild non-specific white matter changes, consistent with rheumatoid arthritis as opposed to some demyelinating process (Exhibit 10-F: 2). Her rheumatoid factor was positive at 11.8 IgM and her serum active protein also positive. Otherwise, her chest x-ray, complete metabolic panel, CBC, sed rate and ANA were normal. The doctor added that the claimant had muscle contraction headaches that was responsive to Motrin with no history of migrainous type of headaches. The physical examination found the claimant well developed, well nourished and in no acute distress with no inflammation of the joints, normal visual fields, no joint edema, clubbing or deformities, 5/5 motor strength in all extremities, normal tone, intact coordination, 2+ deep tendon reflexes in the left biceps and patella, but otherwise 2+ and equivocal Babinski, decreased sensation to temperature in the right lower extremity, but otherwise normal to light touch, pin and vibration, a slow and slightly antalgic gait, otherwise narrow and regular with the ability to walk on heels, toes and tandem without difficulty and negative Romberg (Exhibit 5-F: 4-6).

In September 2004, Dr. Samy Metyas performed a rheumatological evaluation of the claimant at the request of Dr. Davis for complaints of morning stiffness, diffuse body pain, especially to the hands and wrists. She presented with tenderness and swelling of both elbows, wrists, hand joints, knees, ankles and tarsal joints and was diagnosed with rheumatoid arthritis and

See Next Page



fibromyalgia. Testing showed a high Epstein Barr virus, IgG, ESR and rheumatoid factor at 40. Otherwise, she tested normal on CBC, C-reactive protein, urine, chem. Pain, CPK, ANA, CCP, TPO and parvovirus B19 (Exhibit 7-F: 2). August 2004 x-rays obtained by Dr. Metyas showed a normal cervical spine, normal right hand, normal left hand, normal right foot, normal left foot, normal right ankle, normal left ankle and normal right wrist (Exhibit 8-F: 36-44). In September 2004, the claimant admitted that her pain and morning stiffness last 2 hours. Her physical examination was completely normal with 5/5 muscle strength and no atrophy. There were no abdominal abnormalities, neurological abnormalities or spinal/joint abnormalities. Tender points were within normal limits (Id. at 33).

A sleep study performed on September 18, 2004 showed primary snoring with no evidence of sleep apnea or periodic limb movements in sleep (Exhibit 3-F). In October 2004, the claimant admitted that her headaches were fairly easily relieved with Tylenol or Motrin, and that her rheumatoid arthritis medications provided good pain relief. The physical examination found the claimant bright and alert with a steady and regular gait, supple neck, and 5/5 strength in all extremities. The claimant denied neck or back pain (Exhibit 5-F: 2).

No further treatment is recorded from Dr. Shubin's office until June 2005, nearly 1 ½ years, when she was diagnosed with chronic daily headaches described as a combination muscle contraction and migraine components and moderately relieved by medication, but which makes her very drowsy. The claimant was also diagnosed with a history of rheumatoid arthritis, treated with medication, and insomnia. The claimant reported recently starting a fibromyalgia program. Her physical examination found her bright and alert with fluent speech, grossly intact cranial nerves and slightly antalgic gait, but narrow and regular (Exhibit 5-F: 1). In August 2005, Gail Hartley, a registered nurse affiliated with Dr. Shubin's office, noted the claimant's complaints of chronic daily headaches that last 2-3 hours and associated with nausea and sleep disruption. She denied fevers, chills, chest pain, palpitations or shortness of breath. The physical examination found her bright and alert with grossly intact cranial nerves and antalgic but regular gait (Exhibit 8-F: 6). The claimant underwent further therapy in August and September 2005. No trigger points and no limitations in ranges of motion were identified (Id. at 1) to support a finding of fibromyalgia.

In August 2005, Dr. Metyas performed a rheumatological re-evaluation. He diagnosed severe fibromyalgia with fatigue and a limited ability in concentration, due also in part to her medication side effects. The doctor did find the rheumatoid arthritis in remission, but that her other illnesses including severe migraine headaches, multiple complex medications, sleeping problems and interstitial cystitis requiring bladder surgery affect her ability to work (Exhibit 7-F: 1).

In correspondence dated August 9, 2005 written in support of the claimant's disability application, Dr. Andrew Lee confirmed treating the claimant beginning July 2004, primarily for fatigue. Subsequent work-ups revealed rheumatoid arthritis, fibromyalgia, longstanding history of interstitial cystitis and debilitating migraine headaches. The doctor added that the claimant's complex medication regimen produces side effects including a limited ability to concentrate. He advised of an uncertain prognosis, describing the claimant's illnesses as chronic and incurable, and concluded that the claimant was unemployable (Exhibit 6-F: 1).

See Next Page



In August and September 2006, Dr. Sharon Lu found the claimant capable of working, but lifting no greater than 5-10 pounds, the need for a 10-minute break after sitting 30 minutes and no operating of heavy machinery, due to her fibromyalgia, rheumatoid arthritis, interstitial cystitis, migraine headaches, irritable bowel syndrome and depression. This disability is reported to have begun in June 2005 (Exhibit 11-F: 8 and 17). The claimant presented with normal laboratory tests including glucose, lipid panel, CBC, TSH, serum ALT, serum creatinine and urinalysis. An ultrasound of the pelvis was also normal (Id. at 15-16).

The claimant also alleges disabling mental problems. In August 2004, Dr. Shubin found the claimant bright, alert and fully oriented on mental status examination. Despite complaints of being moody, the claimant admitted that her mood had recently been stable (Exhibit 5-F: 4). The claimant testified that she did not follow up with mental health care because she lost her medical insurance and could not afford it. Nonetheless, the record does not show that she attempted to seek treatment at a free or low cost clinic or the large network of County clinics that serve the underserved and indigent community in the metropolitan area. Given the lack of mental health care as well as any supportive documentation from the treating doctors to corroborate any mental limitations, I find that the claimant does not have a severe mental impairment. This results in a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace and no episodes of decompensation.

Counsel objected to the consultative examiner's conclusions, which he described as poorly developed, a copy of which is not in the file. I agree with counsel and will therefore not consider this evaluation. In its stead, I am persuaded by the opinion of the medical expert, Dr. Alpern.

The medical expert at the hearing testified that the medical record confirms chronic and ongoing interstitial cystitis and causing bladder inflammation. Despite a diagnosis of rheumatoid arthritis, the doctor reported that the evidence showed only 1 factor and that was borderline. There were no confirming x-rays and supportive physical descriptions. Antinuclear antibodies were negative with no evidence of lupus. The medical expert further noted the diagnosis of fibromyalgia, but advised that the descriptions offered no tender points to substantiate this diagnosis. There is no mention of irritable bowel syndrome. The doctor did concede that the sed rate was sky high, but explained that this is a non-specific inflammatory sign. He added that there was no evidence of depression and that the record supported no more than mild-to-moderate fatigue. Dr. Alpern considered the possibility of Medical Listing 14.09 being equaled, but ruled this out because of the lack of objective support and the lack of credible pain complaints. He noted that even a recent MRI showed vasculitis, an inflammable condition, but no evidence of inflammatory swelling or x-ray changes. The medical expert concluded that the claimant retained the residual capacity for the full range of light work.

I find that the claimant retains the residual functional capacity for light work, as found by the medical expert, as well as a limitation to occasional climbing, balancing, stooping, kneeling, crouching and crawling activities, as found by the state agency medical consultants in June 2005 (Exhibit 4-F) and November 2005 (Exhibit 9-F). I further find that the evidence supports that the claimant's pain is generally controllable and without serious side effects and thus considered

See Next Page



Kimberly A. Jones (                    Page 5 of 9          **22**

mild in intensity. This was clarified to mean that the claimant is able to maintain persistence and pace with normal breaks.

In so finding, I do not accept the assessments of Drs. Metyas (Exhibit 7-F: 1), Lee (Exhibit 6-F: 1) or Lu (Exhibit 11-F: 8 and 17) regarding the claimant's inability to work. I give greater weight to the treatment notes that were to created by the doctors at the time they examined the claimant and which were created solely for the purpose of creating an official record of the claimant's medical condition, treatment and response to treatment. I do not credit these assessments completed for the purpose of qualifying the claimant for benefits and which are inconsistent with those treatment notes and the claimant's actual daily functioning.

For example, ongoing treatment with Dr. Metyas in October 2004, December 2004, January 2005 and February 2005 continued to show a completely normal physical examination with 5/5 motor strength, no atrophy, no abdominal, neurological or spinal/joint abnormalities and no tender points (Exhibit 8-F: 23, 25, 27 and 31). While the doctor suddenly reported 18 tender points on February 17, 2005, April, May and August 2005 (Id. at 7, 15, 17 and 21), he also reported significant findings of "0" joint pain generally, no swelling or crepitus and normal ranges of motion in the upper and lower extremities bilaterally in February 2005 and April 2005 (Id. at 18, 20 and 24). In May 2005 and July 2005, the claimant reported "feeling well" with a normal physical examination, no joint pain and no swelling (Id. at 14-15). The claimant was discharged from physical therapy having failed to return for her scheduled visits (Id. at 10 and 13). The claimant appears to have returned to Dr. Metyas in August 2005 for the provision of medications. He physical examination continued to be normal with 5/5 motor strength and no atrophy (Id. at 7).

Additional treatment records in December 2005, June 2006 and August 2006 from Dr. Lu confirm the claimant's own admission that her rheumatoid arthritis is in remission. Her primary concern is the fibromyalgia and total body fatigue. However, the physical examination shows no acutely warm or swollen joints and the claimant exhibits near full range of motion in all joints. There is no record of tender or trigger points (Exhibit 11-F: 1-3). This does not support the lifting and sitting limitations imposed. Further, x-rays of the lumbosacral spine and bilateral hands and hips as well as an abdominal ultrasound obtained in 2006 were normal (Exhibit 12-F: 20-23). The claimant is reportedly without synovitis (Id. at 18).

The vocational expert testified that, with a restriction allowing for light exertion and occasional postural limitations and mild pain, the claimant is capable of resuming any one of her prior occupations. The treating

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.**

See Next Page



2.   **The claimant has not engaged in substantial gainful activity since May 28, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).**

3.   **The claimant has the following severe impairments: rheumatoid arthritis, history of interstitial cystitis (20 CFR 404.1520(c) and 416.920(c)).**

4.   **The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

5.   **After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work with a limitation to occasional climbing, balancing, stooping, kneeling, crouching and crawling activities with mild pain.**

In making this finding, the undersigned considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

Because a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the undersigned must consider in addition to the objective medical evidence when assessing the credibility of the claimant's statements:

1. The claimant's daily activities;

2. The location, duration, frequency, and intensity of the claimant's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

See Next Page



4. The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms (SSR 96-7p).

In pre-hearing statements, the claimant complained of diffuse body pain, constantly going to the bathroom, an inability to lift or sit/walk for even short periods, concentration problems (Exhibit 1-E), and daily migraine headaches that last 2-3 hours, the medication for which causes nausea (Exhibit 3-E). The claimant also reported weak muscles causing difficulties holding items for long periods of time, a constant low-grade fever, resting throughout the day, a lack of energy and difficulties even writing. She has to pace herself in doing her household chores (Exhibit 4-E). She reported that her pain medication causes side effects of constipation or diarrhea, headaches, drowsiness and nausea. Her constant pain causes difficulties holding a conversation or enjoying simple pleasures. She is able to stand 10-15 minutes at a time, sit 10-20 minutes and walk maybe 40 yards. She requires assistance with her household chores and lifting groceries (Exhibit 5-E).

The claimant added that her physical condition has caused stress and an inability to concentrate on even small tasks or remember. She complained of constant pelvic pain, fatigue, loss of appetite, general muscle pain and weakness with limited range of motion, frequent trips to the bathroom and the need for assistance with even her personal care (Exhibit 7-E). The claimant explained that she is unable to perform even simple and repetitive tasks on a daily basis because of fatigue, the lack of movement ability and, emotional stress (Exhibit 8-E). She explained that her medication has been changed and this causes vision problems, increased constant headaches and insomnia. She complained of numbness and tingling in the lower legs that becomes constant when sitting or standing for more than 5-6 minutes, an inability to hold or carry even a simple object like a pen and increased depression affecting concentration and memory (Exhibit 10-E).

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

For example, the claimant's many subjective complaints are unrealistic and unsupported. At the hearing, the claimant testified that she lives with her children, ages 15, 17 and 18 and a 6-year-old niece. She also has a new husband who works at nights. She attempted to have me believe that the four children do all the shopping, cleaning, cooking and other chores that she allegedly

See Next Page



no longer can do. However, she then testified that the children are in school all day. The claimant later clarified that her older sons do most of the household chores, but that this just started in the past year. I asked the claimant who performed the household chores prior to her children taking it over in the past year and she responded that she did it all. She added that her average day includes getting up at 7:00 am, taking the children to school, shops, cuts her own hair and nails, cooks and does light housekeeping. I note that the claimant admitted to Dr. Shubin in August 2004 that she does not nap during the day because she has no time, caring for her three active children (Exhibit 5-F: 4). While the claimant alleges virtual inactivity, I note that she has been instructed in 2005 and 2006 in the importance of regular exercise (Exhibit 11-F: 1).

Despite the claimant's allegations of daily migraine headaches, diffuse body pain and the fact that she rests all day, she contradictorily reported that her average day consists of taking her niece to pre-school, do the laundry, straightens up the house, drives a car and prepare simple meals (Exhibit 4-E). Despite allegations that she is constantly going to the bathroom, the claimant acknowledged that she is able to sleep through the night with only two trips to the bathroom (Id. at 3). The claimant visits with family members on a regular basis (Exhibit 5-E). The record does not support the frequency and intensity of her migraine complaints. In fact, the recent evidence makes no mention of this as a medical problem or obvious condition.

At the hearing, the claimant reported an inability to remember, concentrate or focus. However, her in-court presentation did not support this allegation. Moreover, the claimant made no attempts at seeking mental health care for her condition. She claims that she does not have health insurance, but the record does not show that she attempted to seek treatment at a free or low cost clinic or the large network of County clinics that serve the underserved and indigent community in the metropolitan area. It is reasonable to assume that, if the claimant were as disabled in areas of mental functioning, memory, concentration and focus because of her stress, she would have sought some type of care. Moreover, none of the treating or evaluating physicians reports any of these mentation difficulties in their notes. In July 2006, the claimant was described as appearing well, alert and oriented with normal mood and affect (Exhibit 12-F: 9 and 11).

The claimant alleges disabling irritable bowel syndrome and that she is constantly going to the bathroom. However, the records have consistently reported that she has no history of ulcerative disease, chronic diarrhea or bloody stools. Her abdominal examinations have been within normal limits and there has been no chronic problems with her interstitial cystitis since 1999. It was not until December 2005/January 2006 that IBS or an irritable colon was suspected (Exhibit 12-F: 16-17). However, there is no record of ongoing complaints as of March 2006 (Id. at 15) until August 2006 (Id. at 6). Even then subsequent abdominal ultrasound evidence was normal (Id. at 20) and a sigmoidoscopy showed only external hemorrhoids and a single small polyp (Id. at 3). There is no evidence supporting the claimant's assertion that she is constantly going to the bathroom.

The doctors have diagnosed the claimant with rheumatoid arthritis. However, both the claimant and her doctors have described this as "in remission" (Exhibit 7-F: 1 and 11-F: 1). The claimant and her supporters have also diagnosed fibromyalgia. However, there is no consistency in the

See Next Page



Kimberly A. Jones (                    )                                    Page 9 of 9.       **26**

finding to support this diagnosis. No trigger points have ever been reported, only the finding of tender points. Even giving credence to this determination, I also note that the doctors have generally found the claimant to have full or near full range of motion of the joints, 5/5 motor strength, no atrophy and physical examinations generally within normal limits (Exhibit 11-F: 1, 2 and 3; 8-F: 7, 18, 20, 23, 24, 25, 27 and 31).

**6. The vocational expert testified that the claimant is capable of performing her past relevant work as a building inspector, administrative assistant, customer service representative and payroll clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).**

In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as generally and actually performed.

**7. The claimant has not been under a disability, as defined in the Social Security Act, from May 28, 2004 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).**

## DECISION

Based on the application for a period of disability and disability insurance benefits protectively filed on April 29, 2005, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on May 13, 2005, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

Robert A Evans
Administrative Law Judge
APR 1 2 2007
Date

